## J. J. GRADY v. PINK HILL BANK AND TRUST COMPANY.

(Filed 4 October, 1922.)

1. **Banks and Banking—Principal and Agent—Cashier—Personal Interest —Implied Powers of Agency—Inquiry as to Agent's Authority.**

A cashier of a bank has no implied authority, by virtue of his position, to bind the bank by a transaction with another, in which, with the knowledge of the other party, express or implied, he is acting for his own interest alone, and not that of the bank for which he is cashier; and where such third party relies upon a transaction of this character as a credit upon a note he owes the bank, the burden is upon him to show that such authority has been actually or impliedly given the cashier by the board of directors or other officers of the bank having this power.

2. **Same—Dual Agencies—Equity—Innocent Parties—Negligence.**

Where a cashier of a bank accepts as a credit upon a note given to the bank, one given to a borrower by a concern which the cashier largely owns and controls, without the knowledge or consent of the directors or other proper officers of the bank: *Held*, the borrower was put upon notice of the want of authority of the cashier to act for the bank in this respect, and he is not entitled to have such credit allowed upon his note to the bank.

APPEAL by defendant from *Lyon, J.*, at June Term, 1922, of LENOIR. The sole question involved is whether the $5,000 note executed by the plaintiff to the bank has been paid in full or whether there is a balance due of $1,500, and interest. The Bank of Pink Hill was closed by order of the Corporation Commission of North Carolina and placed in the hands of a receiver. Judgment in favor of the plaintiff. The defendant appealed.

*H. D. Williams* for plaintiff.
*Cowper, Whitaker & Allen* for defendant.

CLARK, C. J. G. S. Willard was cashier of the insolvent Bank of Pink Hill for seven years immediately prior to the date when it was closed by order of the Corporation Commission, and was acting cashier at the time of all the transactions involved in this case. Upon the evidence it appears that about a week before the bank was closed, and while it was being examined by the bank examiners, the said Willard disappeared, and the officers and directors of the bank could not ascertain his whereabouts. He returned a few weeks later, and in the meantime the bank had been closed by the bank examiners because of its insolvent condition, and a receiver was appointed under whom the bank is now undergoing liquidation.

It further appears from the evidence that said G. S. Willard, cashier, was also secretary and treasurer and general manager of the chain of

stores doing a general merchandise business under the corporate name of Willard & Smith Company. This company had been organized in December, 1917, and Willard was the promoter of the company, and also the largest stockholder, and as secretary and treasurer and general manager he had complete charge of its finances and signed its checks. The Willard & Smith Company is also insolvent and in the hands of a receiver undergoing liquidation.

On 17 November, 1919, the plaintiff borrowed from the Bank of Pink Hill $5,000 and gave a note for that amount due 17 November, 1920, signed by his wife and J. B. Thomas as sureties. This loan was approved by the loan committee of the bank. Some time after this loan was made and before it was due, Grady placed about $1,500 in money on deposit in the Bank of Pink Hill, and about the same time Willard went to Grady and asked him to lend this money, which was on deposit in the bank at 4 per cent, to Willard & Smith Company, stating that the company would give Grady its note for the loan at 6 per cent, and would make the note payable before 17 November, 1920, so that it could be paid in time for Grady to meet his $5,000 note due the bank. Grady thereupon loaned Willard, for his company, the $1,500, and accepted therefor a note signed by Willard & Smith Company, by G. S. Willard as secretary and treasurer, and bearing as security the personal endorsement of G. S. Willard on the back thereof.

The day before Grady's $5,000 note was due, on 16 November, 1920, he went to the Bank of Pink Hill and paid $2,300 in money to Willard as cashier of the bank on his note. Grady also testified that he pulled out the $1,500 note of the Willard & Smith Company and said to Willard, "I want to use this note, too," and Willard said, "That is all right." Grady thereupon turned over to Willard the $1,500 note and Willard issued a receipt to Grady for $3,800. The testimony of Willard as to this transaction was that he merely accepted the $1,500 note for collection, and at the time told Grady that he would pay the $1,500 note for his company as soon as his company could get the money to pay it with, and he thought the company could pay it by the time the $5,000 note came back from Richmond, where it had been hypothecated with some bank. The records of the bank, which were put in evidence, showed that $2,300 was paid on the Grady note on 16 November, and no entry whatever was made as to the Willard & Smith Company note.

On 17 November, 1920, Grady went back to Willard at the bank, accompanied by J. B. Thomas, and paid $200 in cash and gave a renewal note for $1,000 due 20 January, 1921, endorsed by Thomas, which transaction, Grady contends, paid the $5,000 note in full. Grady testified that Willard did not give him the $5,000 note at that time, stating

that the note was hypothecated with a Richmond bank, but he did obtain a receipt from Willard for $5,000 as full payment of the note.

On 20 January, 1920, when the $1,000 renewal note became due, Grady paid Willard $100 and gave a renewal note for $900. When the bank went into the hands of a receiver, the $900 note was hypothecated with the Farmers and Merchants Bank of Kinston. Grady later paid this note to the Kinston bank, and the canceled note was in evidence.

The books of the Bank of Pink Hill were offered in evidence and showed that proper entries were made on said books, showing all of the payments made by Grady and the renewal notes given by him just as Grady testified to, except as to the first payment, and as to this payment the books of the bank showed an entry of the payment of $2,300 instead of $3,800. No record whatever was made of the $1,500 Willard & Smith Company note on the books of the bank, and said note has never been found among the assets of the bank, and the bank has never owned same nor received a single penny as payment on said note. The $5,000 Grady note was found among the "on hand" notes of the Bank of Pink Hill at the time the bank closed, showing a balance due thereon of $1,500. The only entry of payment on the back of said note was as follows: "Pd. $3,500." This entry was put there by Willard after it had been returned by the Richmond bank.

Grady admitted in his testimony that during all of these transactions with Willard he knew that Willard was cashier of the Bank of Pink Hill, and was also a large stockholder as well as secretary and treasurer and general manager of Willard & Smith Company. He further admitted that when he turned the Willard & Smith Company note over to Willard he knew that Willard had signed this note as secretary and treasurer of the company, and had endorsed his name on the back thereof, and was therefore personally interested in the note. Grady made no inquiry as to whether Willard had authority from the officers of the bank to accept the Willard & Company note to Grady as a payment on the Grady note.

The president of the Bank of Pink Hill and one of the directors, who were both members of the loan committee, testified that neither the loan committee nor the officers and directors of the bank were consulted by Willard or by the plaintiff in reference to accepting the Willard & Smith Company note as payment on the Grady note, and did not know that such had been done; that Willard, the cashier, had never been authorized by them to accept notes of third persons in payment of any indebtedness to the bank, and that he went beyond his authority and disobeyed the instructions given him and the by-laws of the bank in accepting the $1,500 note from Grady as a payment to the bank, if he did so accept it.

The court charged the jury, after stating the contentions of the parties, that the only question for them to determine was whether in the transactions between Grady and Willard on 16 November the $1,500 note of Willard & Smith Company was accepted as an absolute payment on the $5,000 note, or was merely accepted for collection or to be credited thereon when paid. We think this was not the test in this case, whether the plaintiff's note was accepted by Willard as an absolute payment or merely for collection or credit, but the case should be determined rather upon the sound proposition of law that one acting in the capacity as cashier of the bank, and who was at the same time an officer and active manager of another corporation, cannot in law bind the bank in a transaction in which both he and his corporation are adversely interested to the bank, and especially when the third party enters into such transactions with the cashier with full knowledge and notice that the cashier is attempting to so act in a dual capacity. Such transaction is neither binding on the bank as between it and the cashier, nor as to the third party. The authorities seem to be well settled upon this point. In 3 R. C. L., 444, sec. 71, it is said: "The cashier of a bank is its chief executive officer. Still he is but an agent of the bank, and his actions are governed by the general rule applicable to agents, and if he exceeds his authority, his acts will not bind the bank. Whether any particular act does or does not fall within the general power of the cashier is said to be a question of law for the court, and not of fact for the jury, although a question of fact may arise when it is claimed that the acts or conduct of the board of directors have amounted to a public holding out of the cashier as its agent to perform other and unusual acts for the bank."

In this case there was no allegation in the complaint, and no evidence whatever to support any contention that the acts or conduct of the board of directors of the Bank of Pink Hill gave Willard any authority to perform any other acts than those relating to his office.

In 3 R. C. L., 449, sec. 76, it is said: "The cashier has power to receive payment of debts owing the bank, though his authority in this respect is to receive payment only in money, and he has, by virtue of his office, no authority to accept the stock of a corporation in payment of a debt due the bank. And when a person claims a discharge from a debt due to the bank, not by payment, but by giving other or different notes, bills of securities, which the cashier has agreed to take and release the debt, his authority, like that of any other agent, must be shown by proof." This principle of law seems well established, and is conclusive of this case. Among other authorities are *Bank v. Hollingsworth,* 135 N. C., 556; *LeDuc v. Moore,* 111 N. C., 516; *Williams v. Johnston,* 92 N. C., 532; *Gordon v. Price,* 32 N. C., 385; 8 C. J., 572, sec. 794; 21 R. C. L., 73, sec. 72; *ibid.,* 84, sec. 88; *Bank v. Hart,* 20 L. R. A., 780.

11—184

In 21 R. C. L., 84, sec. 88, it is said: "The note of a third person given for a prior debt will be held a satisfaction, where it was agreed by the creditor to receive it absolutely as payment, and to run the risk of its being paid. The onus of establishing that it was so received is on the debtor. But there must be a clear and special agreement that the creditor shall take the paper absolutely as payment or it will be no payment if it afterwards turns out to be of no value. A receipt in full of an account does not establish an agreement on the part of the creditor to accept as absolute payment at his own risk the note of a third person for the debt."

It is a well settled principle of law that the cashier cannot bind the bank by his acts in respect to matters in which he is personally interested, and third persons are bound to know that the cashier has no authority to use the funds of the bank for his own benefit. *Williams v. Johnston, supra; LeDuc v. Moore, supra;* Tiffany on Banks and Banking, 325, sec. 82, and notes; 7 C. J., 552, sec. 162; *Hier v. Miller,* 63 L. R. A., 952; *Bank v. Hart, supra.*

In Tiffany on Banks and Banking, p. 325, it is said: "The authority of the cashier does not extend to transactions that are without the corporate powers. It is confined to transactions which are for the benefit of the bank. It does not extend, for example, to the making of accommodation paper. Nor does it extend to a transaction which is for the benefit of the cashier personally, and one dealing with him with notice that such is the character of the transaction can acquire no rights thereby against the bank, unless the transaction was actually authorized, either expressly or by implication."

*Hier v. Miller, supra,* is almost on all fours with this case. It is there said, discussing the duties of a cashier: "But he could not absorb the funds of the bank in the satisfaction of his private debts without an express and especial authorization. The office of cashier does not import such power. Whether or not such authority actually did exist, the defendant was bound to inquire. It has been well understood from of old that no man can serve two masters. He will hold either to one or to the other. For a like reason the cashier could not serve both himself and the bank in a single transaction, and because he was attempting such a perilous thing, the defendant was put upon guard as to the extent of his power. 'It is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time.' No principle of the law of agency is better settled than that no person can act as the agent of another in making a contract for himself."

It is further said in that case: "It is said that when a bank places an officer at the window, where he transacts its business with the public,

it in effect tells the world that he is trustworthy and reliable, and that he will act within the scope of his authority. It does nothing of the kind. Such a declaration would protect a recipient in the enjoyment of a Christmas gift to the entire body of corporate assets. By placing an officer at the window to do its business a bank publishes to the world that he is there to do its business, and not his business; that he has no power or authority to do any act outside the legitimate prosecution of the corporate enterprise; and that it will not be bound by any perversion of the corporate funds to his personal use."

*Williams v. Johnston, supra,* is exactly in line with the views above expressed. In that case a debtor contracted with an agent who was authorized to collect a debt that he would deliver timber at the agent's mill for the agent's individual use, which was to be applied in payment of the debt. The Court held that the delivery of the timber under this contract did not discharge the debt due the principal. The Court in that case said: "The very relation between the parties requires good faith, and one who participates in his own interest, in the conversion of a trust fund to the use of the agent or trustee, is not allowed to take personal advantage therefrom. It is an unwarrantable inference proposed to be drawn from a general agency, a right to appropriate what is received to the agent's own use in the absence of any previous authority or subsequent sanction to such act. In this aspect the charge is misleading. The inquiry should have gone beyond the existence of a general agency and extended to an assent, actual or implied, to this misuse of her funds. The issue was too narrow and the instruction too restricted. The agent's right to use the property of his principal is not an incident to its management, and such the jury would naturally understand to be the meaning of the instruction."

Upon the evidence and in the light of the above cited authorities, Grady was not an innocent party in this transaction. He admitted time and again in his testimony that he knew all about Willard's financial and business relations with the Willard & Smith Company, and knew that Willard was personally interested in this Willard & Smith Company note which he surrendered to Willard as cashier of the bank, not only as an officer and the largest stockholder in Willard & Smith Company, but as the sole endorser on the note itself. Notwithstanding this full knowledge and notice of the adverse interest between Willard and the bank, and notwithstanding his full knowledge of the great opportunity he was giving Willard to defraud the bank, the plaintiff Grady proceeded to deal with Willard in this transaction without making a single inquiry from the officers or directors of the bank, who were within easy reach, and without even asking Willard himself, or anybody else, a single question as to his authority to bind the bank in such an irregular

and uncustomary transaction in banking business as the one in question. On the other hand, all the evidence shows that Willard, regardless of whether he took the Grady note as an absolute payment or merely for collection or credit, was acting entirely without authority and without the knowledge or consent of the officers or directors of the bank, and was doing an act which was very unusual in banking business. The evidence clearly shows that Grady was not an innocent party, and acted with full knowledge and notice of Willard's dual capacity and personal interest.

Even if Grady was an innocent party and had gone into this transaction without knowledge or notice of Willard's dual capacity and personal interest, it would not relieve him under the facts in this case, for he was the party who made it possible for Willard to defraud the bank, and thus cause the loss which has occurred. In such event, the well known principle of law would apply that when one of two innocent parties must suffer, the party whose negligent acts made the loss possible must be the one to suffer.

The first transaction in this matter was when Willard, acting as cashier, suggested to Grady and induced him to withdraw $1,500 which Grady had on deposit in the bank at 4 per cent, and loan it to his own company with his own endorsement at 6 per cent. This was an act of disloyalty to the bank on the part of Willard, and put Grady on notice of the nature of the transaction. Grady also had notice that Willard was running an independent business in which he was deeply interested.

The real question involved is simply whether Willard, in the absence of express authority on the part of the directors, could take in a note for $1,500 given by his own company and endorsed by himself personally and credit it as a payment upon the note due by Grady to the bank for $5,000. Such a proposition ought to need no citation of authorities, but the absolute necessity of holding such transactions illegal has induced us to cite many authorities condemning such an act as illegal, and we find none to the contrary.

It does not appear, as suggested, that the $1,500 note executed to the plaintiff was to be discounted and placed to the credit of Grady. To do this involves the right of the cashier to discount his own paper, without authority or knowledge of the bank officers, and to place the proceeds as a credit on the note of Grady. The evidence is that even this was not done because when the $5,000 note was found in the possession of the bank by the receiver, there was endorsed on it only the credit of the $3,500 which Grady had actually paid. That credit was endorsed in the handwriting of Willard.

Grady knew, or should have known upon all the circumstances above related, that Willard could not accept his own indebtedness as a credit

upon Grady's note to the bank. Even if the $1,500 note had been discounted, the proceeds thereof would not have been $1,500, but a lesser sum, the discount being deducted.

If bank cashiers can be held by the courts to have authority, and especially as in this case, when there is no attempt to prove authority to do so, to accept their own notes in payment of indebtedness due the bank, no bank can be deemed safe.

The learned counsel for the plaintiff suggested that this transaction was equivalent to Willard handing out his own check for $1,500, and then Grady handing it back to be credited. If Willard had handed out his own check and Grady had paid it in or the check of any other person, and the check had not been paid, the indebtedness of $1,500 due the bank by Grady would not have been discharged. Besides, even if there had been authority to discount this note, the burden of proof of which would have been on the debtor, Grady, the evidence is that it was not discounted and the proceeds were not applied for the endorsement on the note by the cashier shows a credit only of $3,500. Willard gave a receipt for the $5,000 note, but did not cancel and surrender the note to Grady. Even if he had done so, either purposely or by mistake, Grady would still owe the $1,500 which has never been received by the bank. It was not in fact discounted or credited on Grady's note. Willard's testimony is that he took the $1,500 note and told Grady that his company would pay it as soon as it got the money, but there is no evidence that this was ever done. Presumably not, as the company was insolvent. Willard's receipt for the $5,000 does not entitle the plaintiff to recover the uncanceled note when in fact the $1,500 has not been paid.

Grady knew all the circumstances. He knew the disloyalty of the cashier to the bank in the beginning; he knew that the cashier could not accept his own paper as legal tender in discharge of the plaintiff's indebtedness to the bank, and upon the evidence the court should have granted the motion for a nonsuit.

Reversed.